## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHANE KANALY, Derivatively on Behalf of LULULEMON ATHLETICA, INC., <br><br> Plaintiff, <br><br> CALVIN MCDONALD, MEGHAN FRANK, MARTHA MORFITT, DAVID MUSSAFER, MICHAEL CASEY, SHANE GRANT, KATHRYN HENRY, ALISON LOEHNIS, ISABEL MAHE, JON MCNEIL, EMILY WHITE, TERI LIST, KOURTNEY GIBSON, GLENN MURPHY, STEPHANIE FERRIS, and TRICIA GLYNN, <br><br> Defendants, <br><br> and <br><br> LULULEMON ATHLETICA, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **JURY TRIAL DEMANDED** |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Shane Kanaly ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Lululemon Athletica, Inc. ("Lululemon" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have occurred from October 28, 2020 through to July 24, 2024 (the "Relevant Period") and have caused substantial harm to the Company.

2.      Lululemon is a Canadian athletic apparel retailer that focuses on high-quality, performance-based gear for men and women. The company was founded in 1998 by Chip Wilson in Vancouver, Canada, originally as a design studio and yoga studio. Since its early days, it has expanded its product range and international presence, becoming a major player in the global activewear market. Lululemon operates stores in North America, Europe, Asia, and Oceania, with over 500 locations globally.

3.      In October 2020, the Company announced a new "Impact Agenda" that would include an "area of focus" called "Inclusion, Diversity, Equity, and Action" ("IDEA"), the stated goal of which would be to: "Reflect the diversity of the communities the Company serves and operates in around the world by 2025."

4.      Through the Relevant Period, the Individual Defendants caused the Company to fail to disclose that: (i) IDEA was not structured so as to meaningfully combat discrimination within Lululemon; and (ii) as a result, Lululemon employees continued to experience discriminatory treatment.

5.    The truth regarding IDEA emerged on November 20, 2023, when the *Business of Fashion*, and online publication, published an article titled "At Lululemon, Being Black is 'Off-Brand'" (the "BoF Article"). The BoF Article contained accounts from fourteen former Lululemon employees, all of whom maintained that the Company possesses "a corporate culture that is unwelcoming of Black people." The BoF Article further accused IDEA of "protecting the Company's image" thereby "reducing its effectiveness and in many ways exacerbating underlying issues."

6.    In addition to the foregoing, throughout the Relevant Period, the Individual Defendants caused the Company to conceal significant issues with the Company's inventory allocation methods.

7.    The Company reports sales and revenue in three geographic segments: The Americas, China Mainland, and Rest of World. The Americas (specifically, the United States and Canada) represents the majority of the Company's revenue. In fiscal year 2023, Lululemon's net revenue in the three geographic segments was $9.6 billion of which the Americas contributed 79% amounting to $7.6 billion. In fiscal year 2022, Lululemon's net revenue in the three geographic segments was $8.1 billion, of which the Americas contributed 84.1% amounting to $6.8 billion. And in fiscal year 2021, Lulu's net revenue in the three geographic segments was $6.2 billion, of which the Americas contributed 84.7%, amounting to $5.29 billion. As shown in the 2024 proxy, sales in the Americas represented the majority of the Company's revenue.

8.    On March 21, 2024, after market close, Lululemon released a press statement revealing its financial results for the fourth quarter and full year ending January 28, 2024. The report highlighted stagnating growth in the Americas region. Net revenue in the Americas increased by only 9% in the fourth quarter and 12% for the full fiscal year 2023, a noticeable

slowdown compared to the 29% growth seen in the same period the previous year and the 12% growth reported in the prior quarter.

9.    On this news, the price of the Company's common stock fell $75.65 per share, or more than 15%, from a closing price of $478.84 per share on March 21, 2024 to a closing price of $403.19 per share on March 22, 2024.

10.    A few weeks later, on July 9, 2024 Lululemon launched its Breezethrough line. However, shortly after its release, the collection faced significant criticism from customers, who found the design unflattering. Due to this feedback, Lululemon paused the sales of the Breezethrough line just a few weeks later to make design adjustments.

11.    Approximately two weeks later, on July 24, 2024, *Bloomberg* reported that several analysts suggested Lululemon's inventory allocation appeared inconsistent, especially regarding the Breezethrough leggings, which were launched earlier that month both in-store and online. On this news, the Company's stock price fell $9.31, or 3.3%, to close at $272.06 per share on July 24, 2024, on unusually heavy trading volume.

12.    The truth fully emerged on July 25, 2025, when *Bloomberg* reported that a spokesperson for the Company had revealed that the Company "made the decision to pause on sales [of the Breezethrough yoga wear] for now to make any adjustments necessary to deliver the best possible product experience."

13.    On this news, the price of the Company's common stock fell an additional $24.74 per share, or 9.09%, from a closing price of $272.06 per share on July 24, 2024 to a closing price of $247.32 per share on July 25, 2024.

14.    On July 26, 2024, JPMorgan reduced Lululemon's stock price target from $457 to $338 due to the concerns about product execution, which compounded existing issues regarding color palette and in-stock items.

15.    While the Individual Defendants were causing the Company to make false and misleading statements regarding (i) the IDEA program, and (ii) the Company's inventory allocation issues, Defendants McDonald, Henry, and Frank took advantage of the Company's artificially inflated stock price by selling voluminous amounts of personally held shares of Lululemon stock, reaping collective gross proceeds in excess of $19 million.

16.    In addition, the Director Defendants authorized a harmful share repurchase program which enabled the Individual Defendants to cause the Company to repurchase billions of dollars' worth of its own common stock at artificially inflated prices, ultimately causing the Company to overpay for its own stock by over $700 million.

17.    Plaintiff, on behalf of Lululemon, seeks to recover the damages caused to it by the Individual Defendants' breaches of fiduciary duty and other unlawful conduct, as described herein.

## **JURISDICTION**

18.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

19.    This Court has personal jurisdiction over each defendant named herein because

each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through being listed on the Nasdaq in this District, issuing false statements in this District, and maintaining retail stores in this District.

21.     In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

**Plaintiff**

22.     Plaintiff is, and was, at all relevant times a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

23. ***Nominal Defendant Lululemon*** is a Delaware corporation with its principal executive offices located at 1818 Cornwall Avenue, Vancouver, British Columbia, Canada V6J 1C7. The Company's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "LULU."

**Director Defendants**

24. ***Defendant Calvin McDonald*** ("McDonald") has served as a Company director and Chief Executive Officer ("CEO") since August 2018. According to the 2024 Proxy Statement, in 2023, Defendant McDonald received $16,494,777 in total compensation. As a result of the wrongdoing alleged herein, Defendant McDonald faces liability as a named defendant in the factually related Securities Class Action (defined herein).

25. ***Defendant Martha Morfitt*** ("Morfitt") has served as a Company director since December 2008 and as Chair of the Board since March 2022. Defendant Morfitt is a member of the Board's Audit Committee. According to the proxy statement filed on Schedule 14A with the SEC on April 25, 2024 (the "2024 Proxy Statement"), in 2023, Defendant Morfitt received $417,090 in total compensation.

26. ***Defendant David Mussafer*** ("Mussafer") has served as a Company director since September 2014. Defendant Mussafer is the Chair of the Board's Corporate Responsibility, Sustainability, and Governance Committee. According to the 2024 Proxy Statement, in 2023, Defendant Mussafer received $320,424 in total compensation.

27. ***Defendant Michael Casey*** ("Casey") has served as a Company director since October 2007 and previously served as Chair of the Board from May 2014 to September 2014. Defendant Casey is the Chair of the Board's Audit Committee and a member of the Board's People,

Culture and Compensation Committee. According to the 2024 Proxy Statement, in 2023, Defendant Casey received $297,924 in total compensation.

28.     **Defendant Shane Grant** ("Grant") has served as a Company director since November 2023. Defendant Grant is a member of the Board's Audit Committee. According to the 2024 Proxy Statement, in 2023, Defendant Grant received $49,647 in total compensation.

29.     **Defendant Kathryn Henry** ("Henry") has served as a Company director since January 2016. Defendant Henry is a member of the Board's Audit Committee and the People, Culture and Compensation Committee. According to the 2024 Proxy Statement, in 2023, Defendant Henry received $269,590 in total compensation.

30.     **Defendant Alison Loehnis** ("Loehnis") has served as a Company director since January 2022. Defendant Loehnis is a member of the Board's Audit Committee. According to the 2024 Proxy Statement, in 2023, Defendant Loehnis received $257,090 in total compensation.

31.     **Defendant Isabel Mahe** ("Mahe") has served as a Company director since November 2022. Defendant Mahe is a member of the Board's Corporate Responsibility, Sustainability, and Governance Committee. According to the 2024 Proxy Statement, in 2023, Defendant Mahe received $272,773 in total compensation.

32.     **Defendant John McNeill** ("McNeill") has served as a Company director since April 2016. Defendant McNeill is a member of the Board's Corporate Responsibility, Sustainability, and Governance Committee. According to the 2024 Proxy Statement, in 2023, Defendant McNeill received $254,590 in total compensation.

33.     **Defendant Emily White** ("White") has served as a Company director since November 2011. Defendant White is the Chair of the Board's People, Culture and Compensation Committee and a member of the Corporate Responsibility, Sustainability, and Governance

Committee. According to the 2024 Proxy Statement, in 2023, Defendant White received $290,840 in total compensation.

34.    **Defendant Teri List** ("List") has been a member of the Board since March 2024. List is also a member of the Audit Committee.

35.    **Defendant Kourtney Gibson** ("Gibson") served as a Company director from November 2020 through to the annual meeting of stockholders in 2023.

36.    **Defendant Glenn Murphy** ("Murphy") served as a co-chairman of the Board from April 2017 to August 2023.

37.    **Defendant Stephanie Ferris** ("Ferris") served as a Company director from July 2019 through to the 2022 annual meeting of stockholders.

38.    **Defendant Tricia Glynn** ("Glynn") served as a Company director from 2017 through to 2021. During her tenure, Defendant Glynn served on the Company's Nominating and Governance Committee.

39.    Defendants McDonald, Morfitt, Mussafer, Casey, Grant, Henry, Loehnis, Mahe, McNeill, White, List, Gibson, Murphy, Ferris, and Glynn are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

40.    **Defendant Meghan Frank** ("Frank") has served as Chief Financial Officer ("CFO") since November 2020. Defendant Frank joined Lululemon in 2016 as the senior vice president, financial planning and analysis, and served as interim co-chief financial officer from April 2020 until her appointment to chief financial officer. According to the 2024 Proxy, Frank received $4,091,722 in compensation from the Company in 2023, and $3,487,838 in compensation

from the Company in 2022. As a result of the wrongdoing alleged herein, Defendant Frank faces

liability as a named defendant in the factually related Securities Class Action.

41.    Defendants McDonald and Frank are collectively referred to herein as the "Officer

Defendants."

42.    The Director Defendants along with the Officer Defendants are collectively

referred to herein as the "Individual Defendants."

### SUBSTANTIVE ALLEGATIONS

43.    Lululemon Athletica, commonly referred to as Lululemon, is an athletic apparel

retailer known for its high-quality activewear, particularly yoga and fitness gear. Lululemon's

vision was to provide high-performance athletic wear primarily for women interested in yoga

though it has since expanded to a broad range of activewear for both men and women.

44.    Throughout the Relevant Period, the Individual Defendants made false and/or

misleading statements and omissions regarding (i) the Company's IDEA program; and (ii) the

Company's inventory allocation issues.

### THE IDEA PROGRAM

**Racial Social Justice Initiatives**

45.    In the face of decades of underrepresentation at the highest levels of corporate

America, recently, and in light of the fact that even now women only make up 23.3% of directors

globally,[1] there has been a more concerted effort to elevate qualified women to the boards and

upper management of public companies. Companies such as "Arconic, Bayer, Comcast, Covestro,

Eaton, First Commonwealth Financial, GNC, Range Resources, TriState Capital Holdings,

---

[1]    https://www2.deloitte.com/us/en/insights/topics/leadership/women-in-the-boardroom.html (last accessed Nov. 20, 2024).

Wabtec, Wesco International and Koninklijke Philips" have all added female directors during the Relevant Period.[2] As one corporate general counsel put it, "[w]e try to educate boards that having diverse members isn't just the right thing to do; it's the right thing to do because diverse boards deliver better returns to shareholders."[3] Outside the U.S., countries such as Belgium, France, Germany, Norway, and the United Arab Emirates, to name a few, have imposed requirements that their companies maintain minimum number of women on corporate boards.

46.    In addition, while the Individual Defendants caused the Company to fail to keep up with the times, the rest of corporate America, including the tech industry,[4] publicly condemned racism as well as implemented social justice initiatives at a rapid pace.  These efforts were taken to combat systemic racism in America and respond to public outrage over the murders of, among many others, George Floyd, Breonna Taylor, and Ahmaud Arbery.[5] For instance: (1) Microsoft, Intel, and Johnson & Johnson pledged to tie executive pay to certain diversity figures; (2) Google pledged to increase the representations of Black and other underrepresented groups at senior employment levels 30% by 2025; (3) Apple, even in the five years preceding the Relevant Period, increased its hiring of women and historically underrepresented groups in tech from 21% in 2014 to 31% in 2018, and committed to "increase representation in leadership across the company[]"; (4) PepsiCo announced a five-year, $400 million initiative that includes the goal of increasing Black managerial representation by 30% and more than doubling business with Black-owned

---

[2]    https://www.post-gazette.com/business/career-workplace/2020/07/27/Women-corporate-boards-directors-diversity-inclusion-Pittsburgh/stories/202007260028 (last accessed Nov. 20, 2024).

[3]    *Id.*

[4]    https://www.cio.com/article/193856/how-top-tech-companies-are-addressing-diversity-and-inclusion.html (last accessed Nov. 20, 2024).

[5]    https://www.forbes.com/sites/davidhessekiel/2020/06/04/companies-taking-a-public-stand-in-the-wake-of-george-floyds-death/?sh=e62ec4172148 (last accessed Nov. 20, 2024).

suppliers; (5) Adidas committed to filling 30% of new positions with Black or Latino workers; and (6) Alexis Ohanian, the cofounder of Reddit, resigned from Reddit's all-White board, advocated that his seat be filled by a Black individual, and further pledged to use future gains on his Reddit stock to serve the Black community, beginning with Colin Kaepernick's Know Your Rights Camp.

47.    Moreover, Goldman Sachs announced that, effective July 1, 2020, the investment bank would refuse to help companies based in the U.S. or Europe that are without at least one "diverse" board member go public.  Further, given the research that shows that performance is "significantly better" for companies with at least one diverse board member, David Solomon, Goldman Sachs' CEO, stated that "I think [having a "diverse" board] is the best advice for companies that want to drive premium returns for their shareholders over time."

48.    On December 31, 2023, the Nasdaq implemented a rule requiring listed Companies to have diverse boards or explain why they do not.[6] According to *Reuters* at the time the rule was first proposed, the Nasdaq operator said that "over two dozen studies found an association between diverse boards and better financial performance and corporate governance."[7]

49.    Following the rule's initial proposal, on January 7, 2021, *Bloomberg Law* reported other tech companies such as Facebook and Microsoft had thrown their support behind the Nasdaq's diversity plan, urging the SEC to approve the proposal to increase diversity on corporate boards.

50.    Goldman Sachs's policy change and the Nasdaq's rule only serve to emphasize the importance of board diversity and compliance with antidiscrimination policies to maximize

---

[6]    https://news.bloomberglaw.com/esg/contested-nasdaq-board-diversity-rules-take-effect-explained (last accessed Nov. 20, 2024).

[7]    https://www.reuters.com/article/us-nasdaq-sec-diversity/nasdaq-proposes-board-diversity-requirement-for-listed-companies-idUSKBN28B58Q/ (last accessed Nov. 20, 2024).

shareholder value and investor protection and also improve corporate decision making and the monitoring of management.

**Lululemon Establishes the IDEA Program**

51.    In October 2020, following in the steps of the companies that pledged to implement changes aimed at improving diversity representation, the Company announced a new "Impact Agenda" that would include an "area of focus" called "Inclusion, Diversity, Equity, and Action" ("IDEA").

52.    The stated goal of IDEA would be to: "Reflect the diversity of the communities the Company serves and operates in around the world by 2025." However, throughout the Relevant Period, the Individual Defendants caused the Company to fail to disclose that: (i) IDEA was not structured so as to meaningfully combat discrimination within Lululemon; and (ii) as a result, Lululemon employees continued to experience discriminatory treatment.

**Materially False and/or Misleading
Statements Regarding the IDEA Program**

53.    On October 28, 2020, Lululemon issued a press release announcing the Company's "first-ever Impact Agenda detailing the Company's long-term strategy to become a more sustainable and equitable business, minimize its environmental impact, and accelerate positive change both internally and externally." As part of the Impact Agenda, the Company established the IDEA program.

54.    In a written message on the Company's website, Defendant McDonald wrote that the Company launched IDEA because: "In 2020, after many real and impactful conversations with our underrepresented employees and our greater community, we heard loud and clear that we needed to evolve behaviours both within our own walls and our collective." Defendant McDonald went on to write that:

IDEA – Inclusion, Diversity, Equity and Action – focuses on making systemic changes. By standing up and funding IDEA, and creating our commitments grounded in action and accountability, we are determined to be engaged and act in allyship.

For us, IDEA is a critical business function that is embedded into everything we do. We are proud of the progress we are making, and we are a stronger company because of the culture we continue to build together.

55.     On October 30, 2020, the Company issued a press release announcing that it had hired Stacia Jones ("Jones") as Vice President, Global Head of IDEA.

56.     On March 30, 2021, the Company filed an Annual Report on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants McDonald, Frank, Murphy, Casey, Ferris, Gibson, Glynn, Henry, McNeill, Morfitt, Mussafer, and White. With respect to IDEA, the 2020 10-K stated the following, in relevant part:

We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.

Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision. The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve.

*** 

We are investing $5 million to fund to our global IDEA activities. These funds can further support the career progress of our diverse talent and increase access to internal opportunities and professional development. We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

57.     Then, on April 27, 2021, the Company filed its 2021 Proxy Statement on Schedule 14A with the SEC, solicited by Defendants McDonald, Casey, Murphy, Mussafer, Gibson, Morfitt,

14

Henry, McNeill, Ferris, and Glynn. The 2021 Proxy Statement contained the following regarding the IDEA program:

> **Inclusion, Diversity, Equity and Action (IDEA)** The Black Lives Matter movement acted as a powerful catalyst within our organization in fiscal 2020. After many real and impactful conversations with our underrepresented employees and our greater community, we heard that we need to evolve within our own walls to support meaningful, lasting change in the world. We added "Inclusion" as one of our core values, and established IDEA Advisory and Steering Committees, led by our chief executive officer. We hired our global head of IDEA and built a team to work to meet our commitments. We invested $5 million in 2020, and plan to continue investing in 2021 to fund our global IDEA activities. These funds can further support the career progress of our diverse talent and increase access to internal opportunities and professional development.

> \*\*\*

> *Inclusion, Diversity, Equity, and Action (IDEA)*

> We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.

> Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision. The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve. We are proud that as of January 31, 2021, approximately 55% of our board of directors, 65% of our senior executive leadership team, and 50% of all vice presidents and above are women, while approximately 75% of our overall workforce are women.

> We maintain 100% gender pay equity within our entire global employee population, meaning equal pay for equal work across genders. We have achieved pay equity across all areas of diversity in the United States and are seeking, to the extent permitted under local law and regulation, to collect the data necessary to confirm complete pay equity globally.

> We offer all employees IDEA education, training, support, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors, in a variety of forums. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

58.    Notably, while touting the IDEA program and referencing the Black Lives Matter movement, the 2021 Proxy Statement only mentions the Company's gender diversity, but is otherwise silent as to its racial diversity.

59.    On March 29, 2022, the Company filed an Annual Report on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants McDonald, Frank, Murphy, Casey, Ferris, Gibson, Henry, Loehnis, McNeill, Morfitt, Mussafer, and White. With respect to IDEA, the 2021 10-K stated the following, in relevant part:

> We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.
>
> Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision. The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve.
>
> ***
>
> We expect to invest at least $5 million annually to fund our global IDEA activities. These funds can further support the career progress of our diverse talent and increase access to internal opportunities and professional development. We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

60.    Then, on April 27, 2022, the Company filed its 2022 Proxy Statement on Schedule 14A with the SEC, solicited by Defendants McDonald, Mussafer, Murphy, Gibson, Casey, White, Morfitt, Loehnis, McNeill, Henry, and Ferris. The 2022 Proxy Statement contained the following regarding the IDEA program:

> •    IDEA (Inclusion, Diversity, Equity, and Action): Our IDEA mission is to expand being well to encompass a culture of inclusion where diversity is celebrated, equity is the norm, and action is the commitment. In 2021, lululemon made strides in our IDEA journey, building what we believe is an ecosystem of inclusion that

16

resulted in increased representation, a healthier culture, application of inclusive design principles, and the implementation of IDEA in everything we do.

61.    At the time of making the above-referenced statements in 2022, the racial diversity on the Company's Board, as admitted in the 2022 Proxy Statement, was just 9%.

62.    On March 28, 2023, the Company filed an Annual Report on Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants McDonald, Frank, Casey, Mahe, Gibson, Henry, Loehnis, McNeill, Murphy, Morfitt, Mussafer, and White. With respect to IDEA, the 2022 10-K stated the following, in relevant part:

We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.

Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision. The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve.

\*\*\*

We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors. We have established People Networks, which are employee resource groups that represent employees who have marginalized and historically underrepresented identities. We see significant engagement in IDEA education and training across our global employee base. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

63.    On April 27, 2023, the Company filed its 2023 Proxy Statement on Schedule 14A with the SEC, solicited by Defendants McDonald, Casey, Murphy, Mussafer, Gibson, Mahe, Morfitt, White, Henry, Loehnis, and McNeill. The 2023 Proxy Statement contained the following regarding the IDEA program:

•      IDEA (Inclusion, Diversity, Equity, and Action): Our IDEA mission is to expand being well to encompass a culture of inclusion where diversity is celebrated, equity is the norm, and action is the commitment. In 2022, lululemon continued to

make significant strides in our IDEA journey, building an ecosystem of inclusion that resulted in increased representation, a healthier culture, application of inclusive design principles, and the implementation of IDEA in everything we do.

64.     At the time of making the above-referenced statements in 2023, the racial diversity on the Company's Board, as admitted in the 2023 Proxy Statement, was just two of the eleven-person Board.

65.     On March 21, 2024, the Company filed an Annual Report on Form 10-K with the SEC (the "2023 10-K"). The 2023 Form 10-K was signed by Defendants McDonald, Frank, Casey, Grant, Mahe, Henry, List, Loehnis, McNeill, Morfitt, Mussafer, and White. With respect to IDEA, the 2023 10-K stated the following, in relevant part:

> We believe IDEA is fundamental for shaping and building our company, industry, and communities, and for creating a shared sense of respect and belonging. By continuously striving to be an inclusive, diverse, and equitable organization, we aim to reflect a variety of perspectives and meet the needs of the global communities we serve.
>
> ***
>
> We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors. We have established People Networks, which are employee resource groups for employees who have marginalized and historically underrepresented identities. We see significant engagement in IDEA education and training across our global employee base. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

66.     On April 25, 2024, the Company filed its 2024 Proxy Statement on Schedule 14A with the SEC, solicited by Defendants McDonald, Casey, Murphy, Mussafer, Gibson, Mahe, Morfitt, White, Henry, Loehnis, and McNeill. The 2024 Proxy Statement, despite the truth emerging in November 2023 (*see infra*), contained the following regarding the IDEA program:

> •     IDEA (Inclusion, Diversity, Equity, and Action): Our IDEA mission is to expand being well to encompass a culture of inclusion where diversity is celebrated, equity is the norm, and action is the commitment. In 2023, lululemon made

significant strides in our IDEA journey, including increasing diversity within our retail stores. We successfully rolled out our Women Of Leadership cohort and continued to drive IDEA learning through toolkits and our allyship initiative, LEAN (Learning in Equity, Actioning Now). We also advanced more than 200 people through our Inclusion and Equitable Design Certification program, the biggest cohort to date.

67.    At the time of making the above-referenced statements in 2024 (after the truth emerged, thus with knowledge or a reckless disregard of the falsity of the statements), the racial diversity on the Company's Board, as admitted in the 2024 Proxy Statement, was just one of the eleven-person Board.

68.    The above-referenced statements were materially false and/or misleading and/or failed to disclose that: (i) IDEA was not structured so as to meaningfully combat discrimination within Lululemon; (ii) as a result, Lululemon employees continued to experience discriminatory treatment; and (iii) moreover, by failing to ensure that IDEA was structured so as to effectively combat discrimination, the Individual Defendants violated the Code of Conduct.

**The Truth Regarding the IDEA Program is Revealed**

69.    On November 20, 2023, *The Business of Fashion*, which describes itself as the leading digital authority on the global fashion industry, published an article titled "At Lululemon, Being Black is 'Off-Brand'" (the "BoF Article"). The BoF Article interviewed fourteen current and former Lululemon employees who alleged that IDEA failed to achieve its stated goals and, in some cases, perpetuated discriminatory treatment of Lululemon employees. According to the BoF Article, the accounts of these former employees:

> [D]escribe a corporate culture that is unwelcoming of Black people and leaders regularly use stereotypes to define and ostracise minority employees, who face barriers to career advancement that don't seem to apply to white colleagues. Staffers who drew the company's attention to these issues told BoF they were passed over for promotions, reprimanded, and, in several cases, had their employment terminated.

70.    Among other things, the BoF Article tells the story of a Chicago-area Lululemon

store that was closed by management after the store's general manager hired a team of Black associates. Following the store's closure, at least six of the store's sixteen former employees filed complaints against the Company with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination.

71.     The BoF Article also provides the account of one former Black employee who was placed on an improvement plan in June 2022. The employee stated that he believed he was placed on the plan for not "adjusting his language, syntax and grammar to fit in with white colleagues when writing emails and other correspondence." After receiving the improvement plan, the former employee submitted an internal complaint "raising concerns that he believed racial discrimination was at play." According to the BoF Article, the Company informed the former employee that a third-party investigation "did not substantiate" his discrimination claims. The following week, the employee received a termination letter that was viewed by BoF. The BoF Article described the contents of the termination letter as follows:

> Lululemon wrote to [the former employee] that his "belief that Lululemon has a discriminatory culture," and his potential to share those views with job candidates rendered him unable to promote the company as "a positive place to work," which is "critical" to his role as a recruiter.

72.     The BoF Article further alleges that the Company's internal handling of discrimination claims was marred by a conflict of interest. Three former employees "with direct knowledge of how IDEA operates" told BoF that IDEA "played a role in investigating and responding to internal complaints of racism." According to the BoF Article, Jones was named as "head of employee relations, policy, and compliance" in May 2023 and continued to hold that role in addition to heading IDEA. However, the article notes that the Company maintains that discrimination claims are to be handled by the employee relations division, which, as the BoF Article points out, raises ethical concerns as to how Jones could both fairly investigate claims of

discrimination in her employee relations role while also combatting discrimination in her IDEA role.

73.    Describing IDEA as a "misguided DEI initiative," the BoF Articles then states that "Several former employees, including two who worked in the IDEA department, told BoF that they were sceptical of Jones' ability to drive the deep organisational change that the IDEA department promised." The article then closes by explaining the following flaw with IDEA:

> [T]he risk in having DEI sit inside HR — as Lululemon's IDEA department is designed — is that it can be difficult to distinguish between who should be handling what . . . When a diversity chief like Jones reports to the head of that department rather than a CEO, there's a significant risk that diversity is left out of the company's "grand strategy," which is mostly designed by members of the C-Suite — not the HR department.

74.    Following the release of the BoF Article, other publications published articles citing the allegations raised by the BoF Article. On January 5, 2024, during market hours, Yahoo! Finance published an article titled "Lululemon Accused of Performative DEI Practices With a Former Employee Claiming A Supervisor Told Her, 'We Just Need to Ride this Wave.'"

75.    On this news, Lululemon's share price fell $4.90, or roughly 1%, from a close of $496.00 on January 4, 2024, to a close of $491.10 on January 5, 2024.

**Lululemon's Board Suffers from a Lack of Diversity**

76.    While the Individual Defendants were publishing the foregoing misleading statements regarding the IDEA program, the Company's Board suffered from an apparent lack of racial diversity, further underscoring the falsity of the above-referenced statements.

77.    Specifically, as noted above, while the Director Defendants were making the false and misleading statements regarding the IDEA program, the Company's Board suffered from a startling lack of racial diversity as it never had more than two racially diverse members of the Board and, for the majority of the Relevant Period, had just one racially diverse member of the

21

Board.

78.     Accordingly, through the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make the materially false and misleading statements referenced above. Specifically, the statements failed to disclose that the Company did not "continuously striv[e] to be an inclusive, diverse, and equitable organization" nor did it "encompass a culture of inclusion where diversity is celebrated, equity is the norm, and action is the commitment." In addition, the statements failed to disclose that the Company had taken woefully insufficient steps towards eliminating bias in its hiring and promotion process, especially since, through the Relevant Period, it had *zero* Native American, Hispanic, or Pacific Islander directors, and presently has just one director from a minority background.  As a result of the foregoing, the Company's public statements regarding diversity and the IDEA program were materially false and misleading at all relevant times.

## INVENTORY ALLOCATION ISSUES

79.     Lululemon's largest market is the United States, followed by Canada, Europe, and the Asia-Pacific region (especially China). The U.S. accounts for a significant portion of its revenue, but the brand has worked on expanding its presence internationally.

80.     Lululemon's stock began experiencing a significant decline in 2024 due to factors like a softening U.S. market, increased spending on brand awareness, and tempered earnings expectations.

81.     After a strong fiscal year performance in 2023, the Company set lower-than-expected revenue and EPS growth projections for the first quarter of 2024, which led to investor concerns and a drop in stock value.

82.     By mid-2024, Lululemon's stock had decreased about 34% year-to-date as of April,

despite long-term growth potential in its international and men's segments.

83.     Lululemon's stock started declining in early 2024 due to lower-than-expected financial guidance for the fiscal year. Although the company reported strong earnings for the fourth quarter of 2023, its outlook for 2024 fell short of investor expectations and signaled slowing momentum in the North American market.

84.     Lululemon projected revenue growth between 11-12%, below previous market forecasts of around 14%. Additionally, the Company's projected earnings per share (EPS) range of $14.00 to $14.20 missed analysts' expectations, leading to concerns about slowing U.S. sales and increasing competition within the activewear market.

85.     These conservative forecasts indicated potential challenges in Lululemon's largest market (North America) and a possible shift toward back-weighted growth in the second half of the year. The company noted a softer consumer environment in the U.S. and rising expenses aimed at increasing brand visibility, both of which could impact short-term profitability and margin expansion.

86.     Lululemon's Breezethrough line launched on July 9, 2024 with high expectations from both the Company and customers.

87.     However, the new line faced strong customer backlash over fit and design issues, leading the company to pause its sales shortly after release. Customers criticized the leggings' waistband and seam placement, describing the design as unflattering. Although the company claimed the financial impact of this pause was negligible, analysts viewed it as indicative of broader issues with Lululemon's product innovation strategy. The incident contributed to concerns about whether Lululemon's growth may be stalling in a saturated and competitive activewear market.

88.    During the Relevant Period, Lululemon's stock saw a noticeable decline. The stock price dropped from around $511.29 in December 2023 to approximately $272.06 in late July, marking a decrease of roughly 46.8%.

89.    Lululemon's response to its stock decline during the Relevant Period lacked strategic clarity and did not disclose critical information on how negatively the pause of sales of the Breezethrough line had impacted the Company, and it did not fully address concerns about its premium pricing or rising competition in North America.

90.    Instead, Lululemon claimed that they were focusing on "International growth" and glossed over structural issues in its U.S. market. This was a diversion rather than a concrete plan to resolve the underlying challenges impacting its stock value.

91.    On July 25, 2024, the Company's shares fell to $247.32 which marked the lowest level for Lululemon since early 2020.

**False and Misleading Statements**
**Regarding the Company's Inventory Allocation Issues**

92.    On December 7, 2023, the Company issued a press release announcing the Company's net revenue "increased 19% to 2.2 billion" and income from operations "decreased 4% to $338.1 million." The press release then provided the following quote from Defendant McDonald:

> This was another strong quarter for lululemon as our innovative product offerings and community activations continued to powerfully resonate with our guests globally.

93.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "3Q23 10-Q"). Appended to the 3Q23 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McDonald and Frank attesting to the accuracy of the financial reporting contained in the report.

24

94.    The 3Q23 10-Q contained the following risk disclosure:

If we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.

95.    Regarding the Company's inventory allocation, the 3Q23 10-Q stated the following, in relevant part:

The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed. Our inventory balance as of October 29, 2023 was $1.7 billion, a decrease of 4% from October 30, 2022.

96.    On January 8, 2024, the Company released a press statement raising its revenue and earnings projections for the fourth fiscal quarter of 2023, ending on January 28, 2024, stating, in relevant part:

lululemon athletica inc. (NASDAQ: LULU) today announced that, for the fourth quarter of fiscal 2023, the Company now expects net revenue will be in the range of $3.170 billion to $3.190 billion, representing a 14% to 15% increase compared to the fourth quarter of fiscal 2022. The previous guidance range was $3.135 billion to $3.170 billion.

Diluted earnings per share are now expected to be in the range of $4.96 to $5.00 for the fourth quarter of fiscal 2023 compared to the Company's previous guidance range of $4.85 to $4.93.

The Company now expects gross margin to be in the range of 58.6% to 58.7% for the fourth quarter of fiscal 2023, compared to its previous guidance of 58.3% to 58.6%. There is no change to the Company's previous guidance for selling, general, and administrative expenses or effective tax rate.

Meghan Frank, Chief Financial Officer, commented: "We are pleased with our performance during the holiday season, as guests continue to respond well to our innovative and versatile product offerings. Our sales trend remains balanced across channels, categories, and geographies, enabling us to raise our guidance for the fourth quarter and close out another strong year."

**The Truth Regarding the Company's**
**Inventory Allocation Issues Begin to Emerge**

97.     On March 21, 2024, the Company issued press release announcing its financial results for the fourth quarter of 2023 and full year 2023. The press release reported that net revenue in the Americas grew by 9% during the fourth quarter and 12% for fiscal year 2023, falling short of the 29% growth from the previous year and 12% growth in the prior quarter. Specifically, the press release announced the following, in relevant part:

**For the fourth quarter of 2023, compared to the fourth quarter of 2022:**

- Net revenue increased 16% to $3.2 billion.

    o   Americas net revenue increased 9%

                                   ***

    o   Americas comparable sales increased 7%.

                                   ***

- For 2023 compared to 2022:

    o   Net revenue increased 19% to $9.6 billion, or increased 20% on a constant dollar basis.

    o   Americas net revenue increased 12%.

                                   ***

    o   Americas comparable sales increased 8%, or 9% on a constant dollar basis.

                                   ***

During the fourth quarter, we saw continued momentum across our channels, geographies, and merchandise categories, driven by our teams around the world. As we step into 2024, we are focused on the significant opportunities ahead for lululemon as we navigate the dynamic retail environment and deliver for guests through innovative new products and brand activations."

98.     That same day, the Company conducted an earnings call to discuss its financial

results announced in the press release. During the earnings call, Defendant McDonald stated the

following, in relevant part:

> As I mentioned, our sizing in particular in zero to four is something we're chasing
> into. Color, where we had color, it performed well. And honestly, we just did not
> have enough. And both of these attributes over-index in the U.S., which is where I
> see the opportunity. And we're going to continue to play offense in the market. The
> innovation product pipeline remains very strong for this year and we have some
> exciting brand initiatives in addition.

> Where that's showing up? We're seeing a slowdown in traffic in the U.S., but it's
> still positive and conversion is down slightly. And I link that to some of the product
> opportunities we have in the sizing and color, which as I said, we will -- we are
> chasing until we will get stronger through the quarters.

99.    On this news, the price of the Company's common stock fell more than 15%, from

a closing price of $478.84 per share on March 21, 2024 to close at $403.19 per share on March 22,

2024.

100.    Also on that same day, the Company filed the 2023 10-K. Appended to the 2023

10-K were SOX certifications signed by Defendants McDonald and Frank attesting to the accuracy

of the financial reporting contained in the report. The 2023 10-K confirmed the previously reported

financial results and also provided the following risk disclosure:

> If we are unable to anticipate consumer preferences and successfully develop and
> introduce new, innovative, and differentiated products, we may not be able to
> maintain or increase our sales and profitability.

***

> Our results of operations could be materially harmed if we are unable to accurately
> forecast guest demand for our products.

101.    Regarding the Company's inventory allocation, the 2023 10-K stated the following,

in relevant part:

> The timing and cost of our inventory purchases will vary depending on a variety of
> factors such as revenue growth, assortment and purchasing decisions, product costs
> including freight and duty, and the availability of production capacity and speed.
> Our inventory balance as of January 28, 2024 was $1.3 billion, a decrease of 9%

from January 29, 2023. We expect our inventories to decrease during the first half of 2024 compared to the first half of 2023, and then increase in the second half of 2024 compared to the second half of 2023.

102.    Then, on April 25, 2024, the Company released its 2023 Annual Report, highlighting its "impressive pipeline of product innovation" and its ability to effectively execute on product allocation and launches, stating, in pertinent part:

> We believe one of our competitive advantages is our ability to consistently bring newness and innovation into our assortment, and that our proprietary fabrics, innovative designs, and functional technology set us apart.
>
> ***
>
> Our design and development team continues to source technically advanced fabrics, with new feel and fit, and craft innovative functional features for our products. Through our vertical retail strategy and direct connection with our customers, whom we refer to as guests, we are able to collect feedback and incorporate unique performance and fashion needs into our design process. In this way, we believe we are better positioned to address the needs of our guests, helping us advance our product lines and differentiate us from our competitors.
>
> ***
>
> Our operations in the Americas are core to our business and we aim to continue to grow our net revenue in this market through ongoing product innovation and by building brand awareness.

103.    Also on April 25, 2024, the Company filed the 2024 Proxy Statement, solicited by Defendants McDonald, Casey, Murphy, Mussafer, Gibson, Mahe, Morfitt, White, Henry, Loehnis, and McNeill. The 2024 Proxy Statement asked Lululemon shareholders to approve, *inter alia*: (1) the re-election of Defendants McDonald, Mahe, Morfitt, White, Grant, and List to the Board; (2) the ratification of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) on an advisory basis, the compensation of the Company's named executive officers.

104.    Regarding "Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

In its governance role, and particularly in exercising its duty of care and diligence, our board of directors is responsible for overseeing and assessing risk management policies and procedures designed to protect the company's assets and business. While our board of directors has the ultimate oversight responsibility for the risk management process, our board of directors has delegated to the audit committee the initial responsibility of overseeing the company's risk assessment and risk management. In fulfilling its delegated responsibility, the audit committee has directed management to ensure that an approach to risk management is implemented as a part of the day-to-day operations of lululemon, and to design internal control systems with a view to identifying and managing material risks.

On a periodic basis, the audit committee reviews and discusses with the appropriate members of our finance team and our internal auditors the company's significant financial risk exposures and the steps that management has taken to monitor, control, and report those risks. In addition, the audit committee regularly evaluates the company's policies, procedures, and practices with respect to enterprise risk assessment and risk management (including those risks related to information security, cyber security, and data protection), including discussions with management about material risk exposures and the steps being taken to monitor, control, and report those risks. The audit committee reports its activities to the full board of directors on a regular basis and in that regard makes such recommendations to our board of directors with respect to risk assessment and management as it may deem necessary or appropriate.

Further to its risk oversight role delegated from the board, the audit committee maintains a cybersecurity sub-committee that is comprised of our Chief Information Officer ("CIO"), our Chief Information Security Officer ("CISO"), and representatives from the audit committee and board of directors that have knowledge and experience in cybersecurity matters. The cybersecurity sub-committee reviews our cybersecurity risk assessments and the steps being taken to monitor, control, and report on those risks as well as discusses regulatory and market developments. They also review our process for identifying and responding to cybersecurity incidents in a timely manner, and details of cybersecurity attacks or incidents which have occurred. Management generally meets with, and provides reports to, the cybersecurity sub-committee on a quarterly basis. Our CIO and CISO also meet with and provide reports to the audit committee at least quarterly. The board of directors receives periodic reports regarding the activities of the cybersecurity sub-committee. These reports and meetings are designed to inform the board of directors and committees about the current state of our information security program including cybersecurity risks, the nature, timing, and extent of cybersecurity incidents, if any, and the resolution of such matters.

On a periodic basis, the people, culture and compensation committee reviews the various design elements of our compensation policies and practices to determine whether any of their aspects encourage excessive or inappropriate risk-taking by our executive officers. The people, culture and compensation committee reports its

activities in this regard to the full board of directors and makes such recommendations to our board of directors with respect to our compensation policies and practices as it may deem necessary or appropriate.

The board oversees environmental, social and governance management of the company and has delegated responsibility to both the audit committee and the corporate responsibility, sustainability and governance committee. The board and its committees assess whether management has appropriate mechanisms to oversee the development of ESG initiatives, strategies, policies and practices related to matters of sustainability and corporate responsibility that may have material impact on the company. As part of this function, the board and its committees review and discuss reports submitted by management with respect to the company's current goals and metrics, as well as significant events, issues and risks that may affect the company's business or financial performance.

105.    The foregoing statements in the 2024 Proxy Statement (including those referenced *supra* with respect to the IDEA program) were materially false and misleading and/or failed to disclose, *inter alia*, that the Company was experiencing issues with its inventory allocation and color palette execution. Accordingly, the Director Defendants did not effectively "oversee[] and assess[] risk management policies and procedures designed to protect the company's assets and business." Despite this, on June 6, 2024, Company shareholders voted to approve the proposals set forth in the 2024 Proxy Statement. Had shareholders been aware of the truth, including as to the IDEA program, they would not have approved the proposals solicited by the Director Defendants.

106.    On May 21, 2024, the Company issued a press release announcing that the Company was "implementing an updated and more integrated organizational structure," which was "intended to support the company's near- and long-term growth plans, accelerate product innovation, and further enable its go-to-market strategies." The press release quoted Defendant McDonald, claiming that: "the new structure will enable us to solve for the unmet needs of our guests in a more efficient, unique, and powerful way."

107.    On June 5, 2024, the Company issued a press release announcing that the

Company's revenue "increased 10% to $2.2 billion" and income from operations "increased 8% to $432.6 million." The press release further stated, in relevant part:

> Guests responded well to our product innovations across categories, and we are pleased by the progress we are making to optimize our U.S. product assortment. Looking ahead, we continue to have a significant runway for growth and are confident in our team's ability to powerfully deliver for our guests in 2024 and beyond.

108.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q124 10-Q"). Appended to the Q124 10-Q were SOX certifications signed by Defendants McDonald and Frank attesting to the accuracy of the financial reporting contained in the report. The Q124 10-Q contained the following risk disclosure:

> If we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.

109.    The 1Q24 10-Q further asserted that the Company effectively manages inventory allocation, stating in relevant part:

> The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed. Our inventory balance as of April 28, 2024 was $1.3 billion, a decrease of 15% from April 30, 2023.

110.    The above-referenced statements were materially false and/or misleading and/or failed to disclose that: (i) the Company was experiencing issues with its inventory allocation and color palette execution; (ii) as a result, the Breezethrough legging launch underperformed; (iii) due to the foregoing, the Company's sales in the Americas began to stall; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Regarding the Company's**
**<u>Inventory Allocation Issues Fully Emerges</u>**

111.    On July 24, 2024, *Bloomberg* analysts reported that Lululemon's new Breezethrough leggings launch was "raising concerning," noting that the launch had suffered from "inconsistent" inventory allocation and pricing, with "certain locations carr[ying] Breezethrough leggings while others didn't carry the new line," suggesting "ongoing allocation-related issues."

112.    On this news, the Company's stock price fell $9.31, or more than 3%, to close at $272.06 per share on July 24, 2024, on unusually heavy trading volume.

113.    Then, on July 25, 2024, before the market opened, *Bloomberg* published an article entitled "Lululemon Slides as New Product Sales Pause Spooks Analysts." This article reported that a Lululemon spokesperson told the agency that the Company "made the decision to pause on sales [of the Breezethrough product] for now to make any adjustments necessary to deliver the best possible product experience."

114.    On this news, the Company's share price fell $24.74, or 9.09%, to close at $247.32 per share on July 25, 2024, on unusually heavy trading volume.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

115.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

116.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

117.    The Individual Defendants accomplished their conspiracy, common enterprise,

and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

118.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Lululemon, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

119.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

120.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lululemon and at all times acted within the course and scope of such agency.

**INSIDER TRADING**

121.    Defendants McDonald, Henry, and Frank, while in possession of material, non-public information (*i.e.*, the truth regarding the IDEA program, Company's inventory allocation, and the underperformance of the Breezethrough product launch), collectively sold approximately 40,987 shares of Lululemon common stock at artificially inflated prices during the Relevant Period, reaping over $19 million in personal proceeds, as follows:

| Defendant | Date | Shares Sold | Avg. Share Price ($) | Total Proceeds ($) |
|-----------|------|-------------|----------------------|--------------------|
| McDonald | 04/22/2021 | 3,000 | 335 | 1,005,000 |
| McDonald | 09/09/2021 | 10,000 | 427.37 | 4,273,708 |
| McDonald | 12/18/2023 | 25,000 | 497.50 | 12,437,539 |
| Henry | 06/07/2021 | 313 | 331.89 | 103,882 |
| Henry | 06/23/2021 | 432 | 360.79 | 155,860 |
| Henry | 09/15/2021 | 250 | 420 | 105,000 |
| Henry | 09/24/2021 | 250 | 432.41 | 108,103 |
| Henry | 09/12/2022 | 189 | 351.80 | 66,491 |
| Frank | 12/18/2023 | 1,553 | 500 | 776,500 |

122.    Defendant McDonald received a material personal benefit from his insider trading, selling a total of 38,000 shares of artificially inflated Company common stock for personal profits of approximately $17,716,247. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

123.    Defendant Henry received a material personal benefit from her insider trading, selling a total of 1,434 shares of artificially inflated Company common stock for personal profits of approximately $539,336. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

124.    Defendant Frank received a material personal benefit from her insider trading, selling a total of 1,553 of artificially inflated Company common stock for personal profits of approximately $776,500. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

## SHARE REPURCHASES

125.    As reported in the Company's SEC filings, the Director Defendants approved a share repurchase program in January 2019 for up to $500 million of the Company's common stock.

This program was paused in March 2020, but then restarted again in September 2020. Then, in December 2020, the Director Defendants approved an increase in the remaining authorization of the existing stock repurchase program from the $263.6 million remaining to $500 million. On October 1, 2021, the Director Defendants approved a further increase in the Company's share repurchase program from $141.2 million remaining to $641.2 million. During the first quarter of 2022, the Company reportedly completed the stock repurchases under that program.

126.    On March 23, 2022 and November 29, 2023, the Director Defendants approved stock repurchase programs, each for up to $1 billion of the Company's common stock.

127.    Having authorized this share repurchase program, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, as reflected in the below table, thus causing substantial harm to the Company.

| Date | Shares Repurchased | Avg. Share Price ($) | Total Cost ($) | Harm to the Company ($)[8] |
|---|---|---|---|---|
| April 2021 | 269,517 | 311.02 | 83,825,177.34 | 17,168,232.90 |
| May 2021 | 126,219 | 319.68 | 40,349,689.92 | 9,133,206.84 |
| June 2021 | 309,725 | 337.80 | 104,625,105.00 | 28,023,918.00 |
| July 2021 | 69,573 | 375.15 | 26,100,310.95 | 8,893,516.59 |
| August 2021 | 42,034 | 403.83 | 16,974,590.22 | 6,578,741.34 |
| September 2021 | 208,854 | 416.12 | 86,908,326.48 | 35,254,555.20 |
| October 2021 | 331,591 | 399.68 | 132,530,290.88 | 50,521,204.76 |
| November 2021 | 38,385 | 463.93 | 17,807,953.05 | 8,314,574.85 |
| December 2021 | 477,777 | 399.62 | 190,929,244.74 | 72,765,437.10 |
| January 2022 | 327,428 | 343.62 | 112,510,809.36 | 31,531,316.40 |
| February 2022 | 364,581 | 323.27 | 117,858,099.87 | 27,689,926.95 |
| March 2022 | 223,501 | 311.34 | 69,584,801.34 | 14,308,534.02 |
| April 2022 | 120,288 | 375.67 | 45,188,592.96 | 15,438,964.80 |
| May 2022 | 291,967 | 300.98 | 87,876,227.66 | 15,666,949.22 |
| June 2022 | 199,672 | 292.10 | 58,324,191.20 | 8,941,312.16 |
| July 2022 | 8,401 | 297.54 | 2,499,633.54 | 421,898.22 |
| August 2022 | 31,504 | 317.15 | 9,991,493.60 | 2,199,924.32 |

---

[8]     "Harm to the Company" refers to how much the Company overpaid for its own common stock by repurchasing it at artificially inflated prices and is calculated by subtracting what the Company should have paid for its stock (at $247.32 per share, as it was when the truth was revealed) from the "Total Cost," *i.e.*, what the Company actually paid for its common stock.

| Date | Shares Repurchased | Avg. Share Price ($) | Total Cost ($) | Harm to the Company ($)[8] |
|---|---|---|---|---|
| September 2022 | 23,092 | 303.09 | 6,998,954.28 | 1,287,840.84 |
| December 2022 | 101,551 | 333.22 | 33,838,824.22 | 8,723,230.90 |
| January 2023 | 110,980 | 313.92 | 34,838,841.60 | 7,391,268.00 |
| February 2023 | 83,681 | 313.46 | 26,230,646.26 | 5,534,661.34 |
| March 2023 | 75,404 | 303.82 | 22,909,243.28 | 4,260,326.00 |
| April 2023 | 132,626 | 369.32 | 48,981,434.32 | 16,180,372.00 |
| May 2023 | 150,902 | 374.39 | 56,496,199.78 | 19,175,117.14 |
| June 2023 | 188,310 | 361.23 | 68,023,221.30 | 21,450,392.10 |
| July 2023 | 177,615 | 378.45 | 67,218,396.75 | 23,290,654.95 |
| August 2023 | 187,708 | 380.24 | 71,374,089.92 | 24,950,147.36 |
| September 2023 | 203,197 | 383.50 | 77,926,049.50 | 27,671,367.46 |
| October 2023 | 162,446 | 378.34 | 61,459,819.64 | 21,283,674.92 |
| November 2023 | 50,619 | 400.10 | 20,252,661.90 | 7,733,570.82 |
| December 2023 | 10,040 | 507.57 | 5,096,002.80 | 2,612,910.00 |
| January 2024 | 59,180 | 483.73 | 28,627,141.40 | 13,990,743.80 |
| February 2024 | 116,858 | 459.59 | 53,706,768.22 | 24,805,447.66 |
| March 2024 | 186,147 | 441.25 | 82,137,363.75 | 36,099,487.71 |
| April 2024 | 448,222 | 359.42 | 161,099,951.24 | 50,245,686.20 |
| May 2024 | 478,784 | 346.34 | 165,822,050.56 | 47,409,191.68 |
| June 2024 | 658,706 | 309.04 | 203,566,502.64 | 40,655,334.32 |
| July 2024 | 744,582 | 287.77 | 214,268,362.14 | 30,118,341.90 |
| **TOTAL** | **7,791,667** | **-** | **2,714,757,064** | **787,721,981** |

128.    As such, throughout the Relevant Period, while issuing false and misleading statements to the market, the Individual Defendants caused the Company to repurchase over 7.7 million shares of its own common stock at artificially inflated prices, causing it to overpay for its own stock by over *$787.7 million*.

129.    These harmful actions could not be the product of informed business judgment, nor could they be construed as being in the best interests of the Company. As a result, the Company has suffered substantial harm which was caused by, or otherwise permitted by, each of the Individual Defendants, in direct violation of their fiduciary duties owed to the Company.

## DAMAGE TO THE COMPANY

**Securities Class Action**

130.    On September 24, 2024, a securities class action complaint was filed in the United States District Court for the Southern District of New York against the Company the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Patel v. Lululemon Athletica, Inc., et al.*, Case No. 1:24-cv-06033-ALC (S.D.N.Y.) (the "Securities Class Action").

131.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Actions and any liability or settlement that results.

**Unjust Compensation**

132.    At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

133.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

134.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to

carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Share Repurchases**

135.    As detailed above, during the Relevant Period, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, causing the Company to overpay for its own common stock by over $787.7 million.

**Insider Trading**

136.    As also detailed above, Defendants McDonald, Henry, and Frank, while in possession of material, non-public information (described *supra*), collectively sold over 40,000 shares of their personally held stock for collective gross proceeds in excess of $19 million.

**Additional Damage to the Company**

137.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

138.    The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

139.    The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

140.    At all relevant times, the Company had in place extensive corporate governance

documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

141.    Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**The Global Code of Business Conduct and Ethics**

142.    At all relevant times hereto, Lululemon had in place its Global Code of Business Conduct and Ethics (the "Code of Conduct"), which states that it "applies to all lululemon employees, ambassadors, contractors, officers, and directors." The Code of Conduct further states that the Company "support[s] a workplace environment that neither pressures nor encourages anyone to compromise our company's values or standards of conduct."

143.    In a section titled "We comply with all laws, and in doing so we contributed to healthy communities," the Code of Conduct states the following, in relevant part:

> We are all expected to comply with the law. This includes not only following the laws of our home market, but also complying with local laws when visiting different markets or transacting business with individuals, organizations, or guests located in a different market.

***

> **Insider Trading Laws**
>
> We may not buy or sell shares of lululemon stock (or securities of other companies) if we know of material information that has not been made public. Material information is any information that would influence a reasonable investor's decision to buy or sell stock. Examples of "material information" include consolidated sales figures, the departure of an executive, or a significant issue with a key supplier. Trading in shares while in possession of non-public material

information is a serious violation of securities law as is providing non-public material information to someone who may trade in our shares. Never provide material non-public information to other people, including family members or friends as it may enable them to improperly buy or sell securities using confidential information. Please refer to our Insider Trading Policy for more information. Members of our board of directors, executive officers, and certain other employees have additional restrictions on trading in lululemon securities, which are outlined in our Insider Trading Policy.

144.    In a section titled "We are all responsible for fostering a respectful and inclusive workplace," the Code of Conduct provides the following, in relevant part:

We stand for humanity, diversity, and empathy. We strive to provide an environment that creates the conditions for all employees to excel, be creative, take initiatives, feel a sense of belonging, and seize opportunities. Teamwork and collaboration help us to leverage our diverse backgrounds, talents, and ideas for innovative and fresh solutions. Our commitment to inclusive behaviour and ethical conduct, aligned with our values of inclusion and personal responsibility, govern how we interact with guests, vendors, colleagues, and members of the public at all times.

***

We do not tolerate racism, discrimination, harassment or hate. The diversity of our workforce is a critical asset that helps us achieve our goals. We are committed to providing equal opportunity in all aspects of employment and will not tolerate discrimination on the basis of race, color, creed, age, sex, sexual orientation, gender identity or gender expression, national origin, religion, body size, family status, marital status, medical condition, physical or mental disability, military service, pregnancy, childbirth and related medical conditions, or any other legally protected status. We will not tolerate harassment or unlawful behaviours of any kind, including derogatory comments or conduct based on sexual orientation, race, ethnicity, or any other protected status.

145.    In a section titled "Personal responsibility is the path to success," the Code of Conduct states the following, in relevant part:

**Protecting lululemon's Assets**

We all have a responsibility to protect lululemon's assets from improper use or disclosure. This includes, among other things, protecting all non-public information from disclosure, including our trade secrets, design information, information about our suppliers, contracts, and manufacturing processes, guest information, financial information and employee and pricing data, as well as not reproducing licensed or internally developed software for personal use. We also don't permit unauthorized

photography or video recording of any nature in our stores, the SSC, the DCs or any other lululemon property.

*\*\*\**

**Accurate Records**

We must follow our system of internal controls and disclosure controls and ensure that corporate records and all securities filings are timely, legitimate, and accurate. Creating false or misleading records is prohibited, and all financial accounts, reports, and records are expected to be fair, accurate, and appropriately authorized.

**Document Retention**

We are expected to comply with all records management policies and legal hold notices. These policies apply to retention and destruction of all records created by lululemon, including, but not limited to, hard copies, electronic files, emails, instant messages, video, and backup tapes.

146.    In a section titled "Questions, concerns, and dealing with investigations," the Code

of Conduct states the following, in relevant part:

**Waivers**

Waivers or exceptions to the Code for any employee will be granted only in advance and under exceptional circumstances by the Legal department. A waiver of the Code for any executive officer or member of our board of directors may be made only by the board of directors or a designated committee of the board.

**Audit Committee Charter**

147.    Lululemon also maintains an Audit Committee Charter (the "Charter"), which

explains that the purpose of the Board's Audit Committee as follows, in relevant part:

The Audit Committee (the "Committee") is a standing committee of the Board of Directors of lululemon athletica inc. (the "Company"). The primary purpose of the Committee is to assist the Board of Directors in undertaking and fulfilling its oversight responsibilities in connection with:

- reviewing the financial reports and other financial information prepared by the Company for submission to any governmental or regulatory body or the public and monitoring the integrity of such financial reports;

- reviewing the Company's systems of internal controls established for finance, accounting, legal compliance and ethics;

- reviewing the Company's accounting and financial reporting processes generally and the audits of the financial statements of the Company;

- reviewing the Company's Global Risk & Advisory Services function;

- monitoring compliance with legal and regulatory requirements and overseeing the Company's corporate compliance program;

- monitoring the independence and performance of the Company's independent public accountants;

- overseeing the Company's financial risk assessment and risk management policies, procedures and practices;

- overseeing the Company's enterprise risk assessment and management policies, procedures and practices (including regarding those risks related to information security, cyber security and data protection); and

- providing effective communication among the Board of Directors, senior and financial management and the Company's independent public accountants.

148.    The Charter then goes on to detail the "Duties and Responsibilities" of the Audit Committee as follows:

**Review of Financial Reports and Press Releases**

- The Committee shall review and discuss with management and the independent public accountants the audited financial statements and related footnotes to be included in the Company's Annual Report on Form 10-K (or the Annual Report to Stockholders if distributed prior to the filing of Form 10-K) prior to the filing of the Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") and review and discuss with the independent public accountants the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board (PCAOB) and the SEC, and if applicable, the Canadian securities regulatory authorities. The Committee shall recommend to the Board of Directors whether the audited financial statements should be included in the Company's Form 10-K.

- The Committee shall review with management and the independent public accountants interim financial results to be included in the Company's quarterly reports on Form 10-Q to be filed with the SEC and, if applicable, the Canadian securities regulatory authorities, MD&A and the matters required to be

discussed by the applicable requirements of the PCAOB and the SEC prior to the Company's filing of any Form 10-Q.

- The Committee shall review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer, or the Company's disclosure committee or any member thereof, during their certification process for the Form 10-K or Form 10-Q and for the certifications, if applicable, required to be filed with the Canadian securities regulatory authorities, as appropriate. In addition, the Committee shall discuss with the Company's management and independent public accountants whether the Company's quarterly financial statements as well as significant events, transactions and changes in accounting estimates were considered by the independent public accountants (after performing their required quarterly review) to have affected the quality of the Company's financial reporting. Such reviews will occur prior to the Company's filing of the Form 10-K, Form 10-Q and, to the extent practicable, prior to the quarterly earnings release. The Committee shall review the Company's earnings press releases, including the use of "pro-forma" or "adjusted" non-GAAP information (subject to compliance with law and applicable SEC rules, including Regulation G), as well as other publicly disclosed financial information and earnings guidance, prior to the issuance of any earnings press release, and discuss any of the foregoing with management to the extent desired by any member of the Committee. Such discussion may be general in nature (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

**Independent Public Accountants**

- The Committee has responsibility for the retention and termination of the Company's independent public accountants and to set its fees.

- The Committee shall review with the independent public accountants the scope of the prospective audit, the estimated fees therefor and such other matters pertaining to such audit as the Committee may deem appropriate.

- The Committee shall review written disclosures received from the independent auditors regarding the auditors' independence, as required by the applicable requirements for the PCAOB, and shall discuss with the independent auditors their independence.

- The Committee shall pre-approve all auditing services and permitted non-audit services (including the fees for such services and terms thereof) to be performed for the Company or its subsidiary entities by its independent public accountant in one of two methods. For all auditing services, the engagement to render the services would be entered into pursuant to preapproval policies and procedures established by the Committee, provided (i) the policies and procedures are detailed as to the services to be performed, (ii) the Committee is informed of

each service, and (iii) such policies and procedures do not include delegation of the Committee's responsibilities under the Exchange Act to the Company's management.  For non-audit services, the engagement to render the services would be presented to and preapproved by the Committee (subject to the de minimis exceptions for non-audit services described in Section 10A(i)(1)(B) of the Exchange Act that are approved by the Committee prior to the completion of the audit).  The Committee's chairperson will have the authority to grant pre-approvals of audit and permissible non-audit services by the independent public accountants, and all pre-approvals by the chairperson must be presented to the full Committee at its next scheduled meeting.

- At least annually, the Committee shall receive and review a report by independent public accountants describing:

  - o the Company's internal quality-control procedures, other matters relating to the accounting procedures and the books and records of the Company and the correction of controls deemed to be deficient;

  - o any material issues raised by the most recent internal quality-control review, or peer review, of the Company, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and

  - o all relationships between the independent public accountants and the Company.  The report shall include a statement as to whether the relationships between the independent public accountant and the Company will impact on the independent public accountant's objectivity and independence.

- The Committee shall obtain the independent public accountant's assurance that the audit was conducted in a manner consistent with the Exchange Act, and other provisions of applicable law.

- The Committee shall take appropriate action to ensure the continuing objectivity and independence of the independent public accountants.

- The Committee shall review and discuss quarterly reports from the Company's independent public accountants regarding:

  - o all critical accounting policies and practices to be used;

  - o all alternative disclosures and treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such

alternative disclosures and treatments, and the treatment preferred by the independent public accountant; and

o    all material written communications between the independent public accountants and management, such as any management letter or schedule of unadjusted differences.

- The Committee shall recommend to the Board of Directors policies for the Company's hiring of partners, employees, former partners or former employees of the independent public accountants who participated in any capacity in the audit of the Company.

**Financial Reporting, Accounting Principles and Internal Control Matters**

- The Committee shall advise management and the independent public accountants that they are expected to provide the Committee with a timely analysis of significant financial reporting, accounting, or internal control matters.

- The Committee shall review with the Company's management and the independent public accountants their judgments about the quality, not just the acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity and transparency of the disclosures in the financial statements.

- The Committee shall make or cause to be made, from time to time, such other examinations or reviews as the Committee may deem advisable with respect to the adequacy of the systems of internal controls and accounting practices of the Company and its subsidiaries and with respect to current accounting trends and developments, and take such action with respect thereto as may be deemed appropriate.

- The Committee shall adopt and maintain procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

- The Committee may take all other appropriate action, including notifying the SEC, and, if applicable, the Canadian securities regulatory authorities, if the Company fails in any material respect to implement an appropriate response that the Committee has recommended for adoption by the Company.

**Oversight of the Global Risk & Advisory Services Function**

- The Committee shall review the qualifications of the Global Risk & Advisory

Services function and concur on the appointment and replacement of the senior Global Risk & Advisory Services executive. Additionally, the Committee may review periodically the staffing plans, department responsibilities, and budget.

- The Committee shall review the Global Risk & Advisory Services function of the Company, including its independence and authority in the Company's reporting processes, the proposed audit plan for the coming year, and the coordination of such plans with the independent public accountants.

- The Committee shall review, as necessary, the adverse findings from Global Risk & Advisory Services reports along with management's responses. As appropriate, review and discuss with management these findings, repeat audit findings in prior audits or delays in corrective action plans.

- The Committee shall annually review any charter setting out the responsibilities of the Global Risk & Advisory Services function and approve any changes thereto as the Committee deems necessary or appropriate.

**Risk Oversight**

- The Committee shall review the status of compliance with laws, regulations, and internal procedures, contingent liabilities and risks that may be material to the Company, the scope and status of systems designed to assure the Company's compliance with laws, regulations and internal procedures, through receiving reports from management, legal counsel and other third parties as determined by the Committee on such matters, as well as major legislative and regulatory developments, including pronouncements by the Financial Accounting Standards Board, the SEC, the Canadian securities regulatory authorities and other agencies or bodies, on the Company's financial statements.

- The Committee shall meet periodically, but no less than quarterly, with management, the Company's Global Risk & Advisory Services team and the Company's independent public accountants to review and discuss the Company's significant financial risk exposures and the steps that management has taken to monitor, control and report such risks.

- The Committee shall regularly evaluate the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management (including those risks related to information security, cyber security and data protection).

- The Committee shall review and monitor the Company's cybersecurity and information security policies and procedures regarding cybersecurity and information security, and shall regularly report to the Board of Directors at such intervals as determined by the Committee the substance of those reviews and, as necessary, recommend to the Board of Directors such actions as the

Committee determines necessary or advisable.

- The Committee shall report its risk oversight activities to the Board of Directors on a regular basis, but no less than annually, and in that regard shall make such recommendations to the Board of Directors with respect to risk assessment and risk management as the Committee may deem necessary or appropriate.

**Corporate Governance Guidelines**

149.    Lululemon maintains "Corporate Governance Guidelines" (the "Guidelines") that detail the role and responsibilities of the Board as follows:

The Board of Directors (the "Board"), which is elected by the stockholders, is the ultimate decision-making body of lululemon athletica inc. (the "Company") except with respect to those matters reserved to the stockholders. The Board selects the senior management team, which is charged with the day-to-day conduct of the Company's business. Having selected the senior management team, the Board acts as an advisor and counselor to senior management and ultimately monitors its performance.

The fundamental role of the members of the Board is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders. In fulfilling that responsibility, the directors may reasonably rely on the honesty and integrity of the Company's senior management and expert legal, accounting, financial and other advisors.

Directors are expected to attend Board and applicable committee meetings, absent extraordinary circumstances, and to review meeting materials in advance of such meetings. Directors are encouraged to attend the Company's annual meetings of stockholders.

150.    In a section titled "Risk Oversight," the Guidelines provide the following:

In its governance role, and particularly in exercising its duty of care and diligence, the Board is responsible for ensuring that appropriate risk management policies and procedures are in place to protect the Company's assets and business. While the Board has the ultimate oversight responsibility for the risk management process, the Board has delegated to the Audit Committee the initial responsibility of overseeing the Company's risk assessment and risk management. In fulfilling its delegated responsibility, the Audit Committee requires management to ensure that an approach to risk management is implemented as a part of the day- to-day operations of the Company, and to design internal control systems with a view to identifying and managing material risks. On a periodic basis (not less than quarterly), the Audit Committee reviews and discusses with the Company's Chief Executive Officer, its Risk and Advisory team and its Finance team the Company's significant financial risk exposures and the steps that management has taken to

monitor, control and report such risks. In addition, the Audit Committee evaluates the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management, including discussing with management material risk exposures and the steps being taken to monitor, control and report such risks. The Audit Committee reports its activities to the full Board on a regular basis (not less than annually) and is responsible for making such recommendations with respect to risk assessment and management as it may deem necessary or appropriate. On a periodic basis (not less than annually), the PCC Committee reviews the various design elements of the Company's compensation policies and practices to determine whether any of their aspects encourage excessive or inappropriate risk- taking by the Company's executive officers. The PCC Committee reports its activities in this regard to the full Board and makes such recommendations to the Board with respect to the Company's compensation policies and practices as it may deem necessary or appropriate.

The Board oversees environmental, social and governance ("ESG") management at the Company and has delegated responsibility to both the Audit Committee and the CRSG Committee. The Board and its committees assess whether management has appropriate mechanisms to oversee the development of ESG initiatives, strategies, policies, and practices related to matters of sustainability and corporate responsibility that may have a material impact on the Company. As part of this function, the Board and its committees review and discuss reports submitted by management with respect to the Company's current goals and metrics, as well as significant events, issues and risks that may affect the Company's business or financial performance.

## **FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS**

151.    As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

152.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

153.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director

Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

154.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

155.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

> (a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;
>
> (b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
> (c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements

about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

156.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

157.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the

Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

158.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

159.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

160.    Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

161.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

162.    The Company Board is currently comprised of eleven (11) members – Defendants McDonald, Morfitt, Mussafer, Casey, Grant, Henry, List, Loehnis, Mahe, McNeill, and White (*i.e.*, the Director Defendants). Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, six (6), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

163.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

164.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

165.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

166.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

167.    As a trusted Company directors, the Director Defendants conducted little, if any,

oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

168.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

169.    Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

170.    Each of the Director Defendants solicited the proxy statements containing the false and misleading statements, as discussed *supra*, which obtained their re-election to the Board, thus enabling them to continue breaching their fiduciary duties to the Company. As each Director Defendant benefitted, either directly or indirectly, from the false and misleading proxy statements, they are incapable of considering a demand to sue.

171.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

172.    Further, the Director Defendants authorized the harmful share repurchase program and caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing the Company to overpay for its own stock. As such, the Director Defendants face a

substantial likelihood of liability therefor and are incapable of independently considering a demand in the best interests of the Company.

173.    Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for Lululemon for any of the misconduct alleged herein.

## THE DIRECTOR DEFENDANTS ARE
## NOT INDEPENDENT OR DISINTERESTED

**Defendant McDonald**

174.    Defendant McDonald is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant McDonald cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

175.    As CEO, Defendant McDonald also fails the Nasdaq bright-line independence test as set forth in Nasdaq Listing Rule 5605(a)(2) and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant McDonald could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant McDonald is therefore futile.

176.    Defendant McDonald also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant McDonald is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

177.    In addition, Defendant McDonald receives lucrative compensation in connection with his employment with the Company. Defendant McDonald is not independent from Defendants White, Casey, Henry, and Mahe as they comprise the People, Culture and Compensation Committee ("Compensation Committee") and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant McDonald. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant McDonald could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

178.    Furthermore, Defendant McDonald, while in possession of material, non-public information, took advantage of the Company's artificially inflated stock price and sold approximately 38,000 shares of Company stock for personal proceeds in excess of $17 million. As such, Defendant McDonald received a material personal benefit thereby and also faces a substantial likelihood of liability therefor.

179.    Because of Defendant McDonald's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant McDonald is unable to comply with his fiduciary duties and prosecute this action. Defendant McDonald is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendant Henry**

180.    In addition to the foregoing, Defendant Henry is incapable of considering a demand because, through her illicit insider trading, she received a material personal benefit from the

wrongdoing alleged herein and also faces a substantial likelihood of liability therefor. Indeed, while in possession of material, non-public information, Defendant Henry sold her personally held Company common stock, reaping gross proceeds in excess of $500,000.

**Defendant Morfitt, Casey, Grant, Henry, and Loehnis**

181.    Defendants Morfitt, Casey, Grant, Henry, and Loehnis either serve, or served during the Relevant Period, as members of the Audit Committee. Pursuant to the Audit Committee Charter, Defendants Morfitt, Casey, Grant, Henry, and Loehnis were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements.

182.    However, throughout the Relevant Period, Defendants Morfitt, Casey, Grant, Henry, and Loehnis breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding the IDEA program or the Company's inventory issues. Therefore, Defendants Morfitt, Casey, Grant, Henry, and Loehnis each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

183.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

184.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public

disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

185.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

186.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

187.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable

of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

188.    Publicly traded companies, such as Lululemon, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

189.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duty)

190.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

191.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

192.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

193.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent that: (i) IDEA was not structured so as to meaningfully combat discrimination within Lululemon; (ii) as a result, Lululemon employees continued to experience discriminatory treatment; (iii) moreover, by failing to ensure that IDEA was structured so as to effectively combat discrimination, the Individual Defendants violated the Code of Conduct; (iv) the Company was experiencing issues with its inventory allocation and color palette execution; (v) as a result, the Breezethrough legging launch underperformed; (vi) due to the foregoing, the Company's sales in the Americas began to stall; and (vii) the Company failed to maintain internal controls. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

194. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## **SECOND CAUSE OF ACTION**

### **(Against the Individual Defendants for Gross Mismanagement)**

196. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

197. By their actions alleged herein, the Individual Defendants, either directly or through

aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

198.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

199.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

200.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

202.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions; and (iv) causing and/or permitting the Company to repurchase its own common stock at artificially inflated prices.

203.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Unjust Enrichment)

204.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

205.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

206.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

207.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

### (Against the Individual Defendants for Aiding and Abetting)

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to

the breaches of fiduciary duty by the Director Defendants.

210.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

211.    The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

212.    As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

213.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

214.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SIXTH CAUSE OF ACTION

### (Against Defendants McDonald, Henry, and Frank for Insider Trading)

215.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.    By reason of their fiduciary role as officers and directors of the Company,

Defendants McDonald, Henry, and Frank (the "Insider Trading Defendants") specifically owed the Company the highest obligation of due care, good faith, and loyalty.

217.    As directors and/or officers of the Company, the Insider Trading Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

218.    When the Insider Trading Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above and sold Company stock on the basis of such information for collective gross proceeds in excess of $19 million.

219.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold holdings in Company stock.  The Insider Trading Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

220.    As the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## SEVENTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9))

221.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall

be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

223.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

224.    The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

225.    The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2021, 2022, 2023, and 2024 Proxy Statements (the "Proxy Statements") filed with the SEC.

226.    The Proxy Statements were used to solicit shareholder votes in connection with the re-election of the Director Defendants to the Board, among other things.

227.    Specifically, the statements in the Proxy Statements regarding the IDEA program and the Company's commitment to diversity were false and misleading because they failed to disclose that, *inter alia*, the Company did not "continuously striv[e] to be an inclusive, diverse, and equitable organization" nor did it "encompass a culture of inclusion where diversity is celebrated, equity is the norm, and action is the commitment." In addition, the statements failed to

disclose that the Company had taken woefully insufficient steps towards eliminating bias in its hiring and promotion process, especially since, through the Relevant Period, it had *zero* Native American, Hispanic, or Pacific Islander directors, and presently has just one director from a minority background.  As a result of the foregoing, the Company's public statements regarding diversity and the IDEA program were materially false and misleading at all relevant times.

228.    Further, the 2024 Proxy Statement was false and misleading when it discussed the Board's role in risk oversight because, contrary to the statements in the 2024 Proxy Statement, the Director Defendants did not effectively "oversee[] and assess[] risk management policies and procedures designed to protect the company's assets and business."

229.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading.

230.    The materially false and misleading statements contained in the Proxy Statements misleadingly induced shareholders to vote in favor of the election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

231.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

## EIGHTH CAUSE OF ACTION

### (Against the Individual Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder

232.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

233.    During the Relevant Period, the Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a

result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

234.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Lululemon, their control over, and/or receipt and/or modification of Lululemon's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Lululemon, participated in the fraudulent scheme alleged herein.

235.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

236.    The Individual Defendants were each members of Lululemon's Board of Directors and senior management team during the aforesaid time period. Based on their roles at Lululemon,

each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

237.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Lululemon, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

238.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

239.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

240.    As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5

promulgated thereunder and are thus liable for any harm caused to the Company.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, aiding and abetting, and violations of § 10(b) of the Securities Exchange Act of 1934;

C.    Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of § 14(a) of the Securities Exchange Act of 1934;

D.    Awarding, against all the Insider Trading Defendants, disgorgement of all illicitly gained proceeds as a result of their unlawful and disloyal insider trading;

E.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 20, 2024

**GAINEY McKENNA & EGLESTON**

*/s/ Gregory M. Egleston*
Gregory M. Egleston
Thomas J. McKenna
Christopher M. Brain
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com
Email: cbrain@gme-law.com

*Attorneys for Plaintiff*

## **VERIFICATION**

 I, Shane Kanaly am a plaintiff in the within action. I have reviewed   the   allegations   made in   this   shareholder   derivative complaint, know the contents thereof, and   authorize its   filing.   To those allegations of which   I have   personal   knowledge,   I believe those allegations   to be true.   As to   those allegations   of which   I   do   not   have personal knowledge,   I rely   upon   my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

_Shane Kanaly_
Shane Kanaly

DATED:   11/11/2024